**In re GLOBAL DISTRIBUTION NETWORK, INC., Debtor.**

**GLOBAL DISTRIBUTION NETWORK, INC., Plaintiff,**

**v.**

**STAR EXPANSION CO., et al., Defendants.**

**Bankruptcy No. 87 B 03274. Adv. No. 88 A 0665.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Aug. 4, 1989.

Janet S. Baer, Ross & Hardies, Chicago, Ill., for debtor.

Marvin, Freeman, Freeman & Freeman, Chicago, Ill., for Full Line Fasteners.

John C. Sciaccotta, Chicago, Ill., for Hardware Services.

John T. Barber, Barlery, Snyder, Cooper & Barber, Lancaster, Pa., for Lancaster Threaded.

Lloyd S. Hellman, Sandler, Balkin, Hellman & Weinstein, Kansas City, Mo., for Missouri Plating.

Stuart L. Pachman, Clapp and Eisenberg, Newark, N.J., for Star Stainless Screw.

John V. Del Gaudio, Jr., Chicago, Ill., for Creditors in Adversary.

## MEMORANDUM OPINION

RONALD S. BARLIANT, Bankruptcy Judge.

This is an adversary proceeding to avoid and recover numerous preferences.[1] This

---

1. The Debtor filed an adversary complaint against seventy-two defendants to avoid alleged preferential transfers pursuant to 11 U.S.C. § 547(b). Sixty-six of the original seventy-two defendants have settled or defaulted.

On June 23, 1989, the plaintiff filed a supplemental reply memorandum in support of its motion for summary judgment. Attached to that reply was a cover letter in which the Debtor's attorney informed the Court that Star Expansion Co., one of the adversary defendants, will be filing its own bankruptcy petition and the settlement previously reached between the Debtor and Star Expansion is no longer viable. The Debtor, therefore, asked the Court to include Star Expansion in its motion for summary

opinion disposes of motions for summary judgment filed by the Debtor/Plaintiff, Global Distribution Network, Inc., against five Defendants, (Full Line Fasteners, Inc., Hardware Services International, Lancaster Threaded Products, Missouri Plating Company, and Star Stainless Screw Company) and by three defendants (Lancaster Threaded Products, Missouri Plating Co. and Star Stainless Screw Co.) against the Debtor/Plaintiff. Four of the five defendants against whom relief is now sought assert section 547(c)(2) of the Bankruptcy Code as an affirmative defense and contend that the transfers are not avoidable because the transactions were in the ordinary course of business. One defendant contends only that the transfer was made before the 90 day pre-petition preference period. For the reasons set forth below, the Debtor's motions for summary judgment against all five defendants will be granted. In addition, the defendants' cross-motions for summary judgment against the Debtor will be denied.

### FACTS

The Debtor filed its Chapter 11 petition on March 3, 1987. In 1986 the defendants provided goods related to the Debtor's industrial fastener business and submitted corresponding invoices to the Debtor that carried the price terms "net 30 days", "net 10 days" or "net 10th prox." The Debtor paid for the goods with checks dated from 30 to 115 days after the dates of the corresponding invoices. The checks were paid by the Debtor's bank, from 75 to 127 days after the invoice dates. All the checks involved here were honored within the ninety days before the Debtor filed its bankruptcy petition.

Pursuant to Local Rule 12(l), the Debtor submitted statements of material facts as to which there is no genuine issue. None of the defendants submitted a statement of genuine issues pursuant to Local Rule

12(m). The Debtor's statements of material facts are therefore deemed admitted as required by Local Rule 12(m).

The facts derived from the Debtor's 12(l) statements, as well as the defendants' affidavits and interrogatories, are as follows:

FULL LINE FASTENERS:
—Date and amount of invoices corresponding to alleged preferential transfer: 1) 8/7/86 for $481.75, 2) 8/13/86 for $3,620.70, 3) 8/13/86 for $85.82.

| | |
|---|---|
| —Amount of Payment: | $2,188.27 |
| —Date of Check: | December 1, 1986 |
| —Date Check Paid: | December 8, 1986 |
| —Days between Payment and Invoice Date: | Not applicable (not alleging affirmative defense) |
| —Payment History: | " |
| —Invoice Credit Terms: | " |

HARDWARE SERVICES:
—Dates and amounts of invoices corresponding to alleged preferential transfer: 1) 8/8/86 for $54.06, 2) 8/8/86 for $423.28, 3) 8/8/86 for $141.68, 4) 8/8/86 for $2,187.00, 5) 8/11/86 for $25.85, 6) 8/11/86 for $599.38, 7) 8/22/86 for $335.28, 8) 8/29/86 for $41.80, 9) 8/29/86 for $70.84.

| | |
|---|---|
| —Amount of Payment: | $3,737.49 |
| —Date of Check: | October 27, 1986 |
| —Date Check Paid: | December 11, 1986 |
| —Days between Payment and Invoice Date: | 104 to 125 days |
| —Average time between Payment and Invoice Date: | 118.11 days |
| —Payment History: | 63 to 93 days from invoice date |
| —Average time for payment in prior course of dealings: | 75.59 days |
| —Invoice Credit Terms: | "Net 30 days" or "Net 10 days" |

LANCASTER THREADED:
—Date and amount of invoice corresponding to alleged preferential transfer: 1) 8/15/86 for $1,212.15.

| | |
|---|---|
| —Amount of Payment: | $1,212.15 |
| —Date of Check: | October 27, 1986 |
| —Date Check Paid: | December 17, 1986 |
| —Days between Payment and Invoice Date: | 124 |
| —Payment History: | 72 to 84 days from invoice date |
| —Average time for payment in prior course of dealings: | 74.25 days |
| —Invoice Credit Terms: | "Net 30 days" |

MISSOURI PLATING:
—Dates and amounts of invoices corresponding to alleged preferential transfer: 1) 9/2/86 for $215.09, 2) 9/3/86 for $55.50, 3) 9/4/86 for

---

judgment. The Debtor filed a Local Rule 12(l) statement for Star Expansion.

The Court cannot rule on a motion for summary judgment against Star Expansion at this time because no such motion is properly before the Court. Moreover, Star Expansion has had

no opportunity to respond to a summary judgment motion against it or to file a statement of material facts pursuant to the Local Rules.

The Court will, therefore, not resolve the Debtor's dispute with Star Expansion in this memorandum opinion.

$1,095.15, 4) 9/8/86 for $198.58, 5) 9/9/86 for $77.80, 6) 9/10/86 for $183.60, 7) 9/12/86 for $520.50, 8) 9/12/86 for $85.14, 9) 9/15/86 for $76.70.

| | |
|---|---|
| —Amount of Payment: | $2,508.06 |
| —Date of Check: | December 19, 1986 |
| —Date Check Cashed: | December 26, 1986 |
| —Days between Payment and Invoice Date: | 102 to 115 days |
| —Average time between Payment and invoice date: | 108.67 days |
| —Payment History: | 25 to 80 days from invoice date |
| —Average time for payment in prior course of dealings: | 55 days |
| —Invoice Credit Terms: | "Net 10th Prox." |

STAR STAINLESS:

—Dates and amount of invoices corresponding to alleged preferential transfer: 1) 8/5/86 for $303.18, 2) 8/8/86 for $245.69, 3) 8/25/86 for $420.18, 4) 8/27/86 for $762.42, 5) 8/28/86 for $339.23, 6) 8/28/86 for $16.42, 7) 8/29/86 for $616.18, 8) 8/29/86 for $163.33, 9) 9/9/86 for $300.23, 10) 9/23/86 for $22.55.

| | |
|---|---|
| —Amount of Payment: | $3,824.54 |
| —Date of Check: | October 27, 1986 |
| —Date Check Paid: | December 11, 1986 |
| —Days between Payment and Invoice Date: | 79 to 127 days |
| —Average time between Payment and invoice date: | 104.9 days |
| —Payment History: | 97 days. (Only one payment.) |
| —Average time for payment in prior course of dealings: | Not applicable |
| —Invoice Credit Terms: | "Net 30 days" |

## DISCUSSION

There is no dispute that the Debtor has shown, with respect to each of the defendants, that all but one of the section 547(b) requirements have been satisfied.[2] Specifically, the Debtor has shown that 1) transfers of the Debtor's property were made, 2) to or for the benefit of creditors, 3) for or on account of antecedent debts, 4) while the Debtor was insolvent, and that 5) the defendants received more than they would have in a Chapter 7 liquidation. There is a dispute about one of the elements of a preference, whether the transfers were made within 90 days before the bankruptcy

**2.** Section 547(b) provides in relevant part:
[T]he trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition;

petition was filed. And the parties also dispute the applicability of the ordinary business expense exception to the Debtor's power to avoid a preference, 11 U.S.C. § 547(c)(2).

The motions for summary judgment are made pursuant to Federal Rule of Civil Procedure 56 and Bankruptcy Rule 7056. Summary judgment is only appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Once the moving party has overcome its burden of showing that there is no basis in the record for findings of fact that might determine a result in favor of the non-movant, its opponent must introduce more than a scintilla of evidence that there is some doubt as to the material facts. All evidence and any reasonable inferences drawn therefrom must be viewed most favorably to the non-movant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *In re Calisoff,* 92 B.R. 346, 350–51 (Bankr.N.D.Ill.1988).

## I. DATE OF THE TRANSFERS

Only Full Line Fasteners contends that the Debtor's transfer was made more than ninety days before the Chapter 11 petition was filed.

The Debtor's check to Full Line Fasteners for $2,188.27 was dated ninety-three days before the petition was filed, but it was paid by the Debtor's bank only eighty-six days before the petition was filed. If the transfer was made when the check was dated, as Full Line Fasteners argues, then the transfer may not be avoided. If the transfer was made when the check was honored, as the Debtor contends, then all elements of section 547(b) would be satis-

(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

fied and, since Full Line Fasteners has asserted no affirmative defenses, summary judgment would be appropriate.

As a matter of state law, the issuance of a check does not operate as an assignment of funds held by the drawee bank, and the funds in the maker's checking account are not transferred until the check is honored. Ill.Rev.Stat. ch. 26 ¶ 3–409. *See Tri–State Bank v. Blue Ribbon Saddle Shop, Inc.,* 76 Ill.App.3d 445, 32 Ill.Dec. 230, 233, 395 N.E.2d 177, 180 (1st Dist.1979); *Leavitt v. Charles R. Hearn, Inc.,* 19 Ill.App.3d 980, 312 N.E.2d 806, 809 (1st Dist.1974). A third party may acquire rights superior to those of the payee until a check is honored by the drawee bank, and the maker can stop payment on a check until it is honored. *In re Foreman,* 59 B.R. 145, 148 (S.D. Ohio 1986). A transfer of the Debtor's property for purposes of section 547(b), therefore, occurs when the debtor's bank honors the check rather than upon issuance of the check by the debtor. *Foreman,* 59 B.R. at 148; *In re Almarc Mfg., Inc.,* 52 B.R. 582, 585 (Bankr.N.D.Ill.1985). All elements of section 547(b) are established as to Full Line Fasteners and the Debtor's motion for summary judgment against Full Line Fasteners will be granted.

## II. ORDINARY BUSINESS EXPENSE EXCEPTION

■ The only remaining issue is whether the transfers fall within the ordinary business exception set out in section 547(c)(2) of the Bankruptcy Code. Four of the defendants contend that the ordinary course of business for the parties was established by a pattern of consistently late payments made long after expiration of the contractual credit terms. They contend that the credit terms were thereby modified. Therefore, the defendants argue, the preferential payments made within the modified credit terms were, in fact, made in the ordinary course of business and should be unavoidable as preferences. The Debtor counters that the ordinary course of business was established by the contractual credit terms, and payment made long after expiration of those terms cannot be within the ordinary course of business. Alter-

nately, the Debtor contends that transfers were made to some defendants after even any modified credit terms expired.

Section 547(c)(2) provides:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

The parties agree that the preferential transfers were payments for debts incurred in the ordinary course of business. Sub-section (A) of section 547(c)(2) has, therefore, been satisfied. The parties, however, disagree as to the remaining two requirements of section 547(c)(2): 1) Whether the transfers were made in the ordinary course of the parties' business, and 2) whether the transfers were made according to ordinary business terms.

Decisions analyzing section 547(c)(2) frequently consider the following factors: 1) the prior course of dealings between the parties, 2) the amount and timing of the payments, and 3) the circumstances surrounding the payments. *See, e.g., In re First Software Corp.,* 81 B.R. 211, 213 (Bankr.D.Mass.1988); *In re White,* 58 B.R. 266, 269 (Bankr.E.D.Tenn.1986).

The test applied by the majority of apposite decisions is rather mechanical. The timing of preferential payments is compared to the course of dealings established by the payment history between the parties. If the preferential payment was made within the time period set by the course of dealings, then the payment was made within the ordinary course. Any other irregularities may also be considered to ferret-out unusual transactions. *See Matter of Xonics Imaging, Inc.,* 837 F.2d 763, 766 (7th Cir.1988) ("if the terms of the lease had been modified [by course of deal-

ings] before the preference began to run, and 'late' payment were timely under the modified terms, § 547(c)(2) would provide a safe harbor ...")

For example, in *In re First Software Corp.*, 81 B.R. 211 (Bankr.D.Mass.1988), the debtor paid three invoices within the ninety day reach-back period. The three payments were made eighty-six, eighty-eight and 109 days respectively after the invoice date. During its prior course of dealings with the creditor, the debtor made its payments within thirty-five to 134 days after the invoice dates. On average, the debtor paid its invoices within 71.7 days after the invoice date.[3] Without further elaboration, the court held that only the payment made 109 days after the invoice date was made outside the ordinary course of business. The payments made fourteen and sixteen days after the average late payment period of 71.7 days were found to be within the ordinary course of business. *See also In re Jerry Sue Fashions, Inc.*, 91 B.R. 1006 (Bankr.S.D.Fla.1988) (payments made 49–74 days after invoice date were within ordinary course of business where the debtor had been allowed to considerably exceed the 30 day contractual payment terms); *In re White*, 58 B.R. 266 (Bankr.E. D.Tenn.1986) ($15,000 payment made within 63 days of filing bankruptcy petition was within the ordinary course of business where the debtor established an irregular payment history that exceeded contractual terms).

Other authorities (a minority) require an additional showing by the defendant/transferee. First, as required by the majority approach, the transfer must have been made in the ordinary course or financial affairs of the debtor and the transferee. In addition, the minority approach requires proof that the transfer was made according to ordinary business terms. *See In re Websco*, 92 B.R. 1, 3 (Bankr.D.Me.1988);

*Matter of Unimet Corp.*, 85 B.R. 450 (Bankr.N.D.Ohio 1988); *In re Steel Improvement Co.*, 79 B.R. 681 (Bankr.E.D. Mich.1987). The minority approach separately recognizes the provisions of sub-sections (B) ("ordinary course of business" of the parties) and (C) ("ordinary business terms") of section 547(c)(2) by requiring evidence of the industry standard to satisfy subsection (c).[4] The court in *Steel Improvement* described the minority approach:

The additional test [of the minority approach] is whether

the manner and timing of the late payments at issue were consistent with the ordinary course of business in the parties' industry. [Citations omitted].

The difficulty with the majority approach is that either it ignores subparagraph (C) of Section 547(c)(2) and thereby makes it a nullity, or it interprets subparagraph (C) to require the same showing as subparagraph (B) and thereby makes it superfluous.

79 B.R. at 684. *In accord In re Southern Commodity Corp.*, 78 B.R. 626, 628 (Bankr.S.D.Fla.1987) ("Section 547(c)(2)(C) requires that payments be made according to terms ordinary in the *industry* not in the prior dealings of the parties.")

Although the minority approach broadens the focus of the ordinary course exception, the analysis remains substantially similar. Application of the minority approach is illustrated by *Southern Commodity Corp.* The court focused on the prior course of dealings between the parties and the industry standard for payment. *See also Websco*, 92 B.R. at 3 ("[I]f the creditor-transferee can satisfy its burden that [the late payment] was consistent with the parties' prior course of dealings and, to a lesser extent, was consistent with common industry practice, then the ordinary course of business exception will apply and

---

**3.** The average time for late payment was determined by adding the total number of days between the invoice dates and the payments and dividing the sum by the number of payments. 81 B.R. at 213.

**4.** The Seventh Circuit in *Xonics* acknowledged the split in authority between the majority and minority approaches. 837 F.2d at 766. Since the parties in *Xonics* stipulated that the preferential transfers were made pursuant to ordinary business terms, the court did not have an opportunity to adopt one of the two approaches.

recovery of the preferential transfer will be denied.") Past dealings between the parties in *Southern Commodity Corp.* showed that the average time between the invoice date and payment was thirty-six days and the longest was fifty days after the invoice date. The industry practice was net thirty days for packaged goods or net ten days for bulk. The preferential payments were for both packaged and bulk goods and were made from fifty-five to ninety days after the invoice dates. The court found that none of the payments was made in the ordinary course of business or according to ordinary business terms. 78 B.R. at 629.

The Court will, therefore, consider the following factors to determine whether the defendant/transferees have established the requirements of sub-sections 547(c)(2)(B) and (C): 1) The prior course of dealings between the parties; 2) the amount and timing of the payments; 3) the standard industry credit terms and 4) the circumstances surrounding the transfers.

## III. APPLICATION OF THE ORDINARY BUSINESS EXPENSE DEFENSE

### A. HARDWARE SERVICES

The unrefuted evidence presented by the Debtor establishes that the payment in question was made on December 11, 1986, eighty-two days before the petition was filed. That transfer was made 104 days after the date of the most recent invoice satisfied by the payment and 125 days after the earliest such invoice. The average number of days between the invoice dates and the allegedly preferential transfer was 118.11 days.[5] The Debtor and Hardware Services established a course of dealings in which payments made within sixty-three to ninety-three days after the invoice dates were accepted as timely. The average amount of time it took the Debtor to pay its invoices in its prior course of dealings with Hardware Services was 75.59 days. Viewing the evidence most favorably to Hardware services, the transfer was, at best, eleven days late when compared to the parties late payment practices.[6] That measure, however, is not an accurate indicator of the ordinary course of business. A more accurate comparison is between the average payment periods. *See First Software*, 81 B.R. at 213. Viewed in those terms, the preferential payment was over forty-two days late. (That is, 118.11 days less 75.59 days).

The ordinary course of business exception is an affirmative defense on which the defendant/creditor has the burden of proving all elements of that defense. On its motion for summary judgment, the Debtor here has introduced evidence showing that there are no genuine issues of material fact and that as a matter of law, the transfer to Hardware Services was not made in the ordinary course of business of the Debtor and Hardware Services. Hardware Services has presented no evidence to the contrary.[7] The Debtor's motion for summary judgment against Hardware Services will, therefore, be granted.

---

5. Following the analysis of *First Software Corp.*, 81 B.R. at 213, the average preferential payment period was determined by adding the total number of days between the nine invoice dates and the preferential payment and dividing the sum by the number of invoices. All average time periods in the case at bar have been computed in a similar fashion.

6. One-hundred-four days elapsed between the most recent invoice and the preferential transfer. In the parties' prior course of dealings, Hardware Services accepted as timely a payment made ninety-three days after the invoice date, which was the longest prior credit period between the parties. The difference is eleven days.

7. Hardware Services did file an unsigned affidavit that attempts to establish that the applicable ordinary business terms support the defendants' position. That affidavit will be discussed later in this opinion. For now, it is enough to say that Hardware Services has offered no evidence that supports its contention that the transfers were made "in the ordinary course of business . . . of the debtor and the transferee." 11 U.S.C. § 547(c)(2)(B). Under both the majority and minority approaches to the ordinary business expense defense, it is therefore unnecessary to consider the "ordinary business terms" issue of subsection (C).

## B. LANCASTER THREADED

It is uncontested that the Debtor made one allegedly preferential payment to Lancaster Threaded 124 days after the corresponding invoice. It is also uncontested that the Debtor paid its invoices in its prior course of dealings with Lancaster Threaded within seventy-two to eighty-four days from the invoice date. The average number of days for payment in the parties' prior course of dealings was 74.25 days. Viewing the evidence most favorably to Lancaster Threaded, the preferential transfer was made forty days after the latest timely payment in the prior course of dealings, and forty-nine days after the average payment period.

Again, even the most favorable interpretation of the facts does not suggest that the payment on December 17, 1986 to Lancaster Threaded was made in the parties' ordinary course of business. Since there is no genuine issue of material fact as to an element of section 547(c)(2) and the Court finds as a matter of law that the preferential transfer was not made in the ordinary course of business, the Debtor's motion for summary judgment will be granted and the cross-motion for summary judgment by Lancaster Threaded will be denied.

## C. MISSOURI PLATING COMPANY

It is uncontested that the Debtor made a payment on December 26, 1986 to Missouri Plating in full satisfaction of nine invoices dated from 102 days to 115 days before the date of payment. That preferential payment was made an average of 108.67 days after the invoice dates. In the parties' prior course of dealings, Missouri Plating accepted as timely payments made from twenty-five days to eighty days after the invoice date. The average late payment in the parties' prior course of dealings was fifty-five days after the invoice date. Comparing the average late payment in the prior course of dealings (55 days) to the average number of days between the preferential payment and the corresponding invoices (108.67 days), the payment was over fifty-three days late. Even comparing the shortest interval between the preferential transfer and the corresponding invoice (102 days) to the latest payment in the parties' prior course of dealings (80 days), the preferential payment was twenty-two days late. Once again, the Court cannot say that a payment made over fifty-three days late, or even twenty-two days late, was made in the ordinary course of business of the Debtor and the transferee. Since there is no genuine issue of material fact as to the absence of an ordinary course transaction, the Debtor's motion for summary judgment will be granted and the cross-motion for summary judgment by Missouri Plating will be denied.

## D. STAR STAINLESS SCREW COMPANY

Finally, it is uncontested that the Debtor made a payment to Star Stainless Screw on December 11, 1986 which is within the preference period, and that the parties' prior dealings consisted of only one payment made ninety-seven days after the invoice date. There is some uncertainty about the number of days between the invoices and the payment at issue here. In its Local Rule 12(*l*) statement, the Debtor listed ten invoices for which the December 11, 1986 payment was allegedly made. The number of days between those invoice dates and the December 11, 1986 transfer ranged from seventy-nine to 127 days and averaged 104.9 days. In exhibit B to its memorandum in support of its motion for summary judgment, however, the Debtor said that the timing of the preference ranged from seventy-three to ninety-seven days. Star Stainless Screw, of course, agreed with the more favorable seventy-three to ninety-seven day range.

It is unlikely that a single transaction can establish a discernable prior course of dealings between the parties. The official comment to section 1–205 of the Uniform Commercial Code states that "[a] course of dealings under subsection (1) [of section 1–205] is restricted, literally, to a sequence of conduct between the parties ..." State court decisions support the proposition that a single transaction does not establish a course of dealings. *See, e.g., Extruders,*

*Inc. v. Ceppos*, 46 N.Y.2d 223, 413 N.Y. S.2d 141, 385 N.E.2d 1068 (1978); *Atlanta Corp. v. Ohio Valley Provision Co.*, 489 Pa. 389, 414 A.2d 123 (1980); *But see, Steinmetz v. Bradbury Co.*, 618 F.2d 21, 25 (8th Cir.1980) (applying Iowa law, "the Code by its terms seems to leave open the possibility that a course of dealings could arise out of the circumstances of a single transaction ...")

In the absence of any clear showing of an ordinary course of business between the parties, it is appropriate to look to industry practices and standards, for purposes of both subsection 547(c)(2)(B) ("ordinary course of business") and subsection 547(c)(2)(C) ("ordinary business terms"). The Debtor filed the affidavit of Ronald Quick, a veteran of 15 years in the fastener industry, who attested to an industry standard of "net 30 days." He stated "[i]f goods are not paid for in 30 days, notwithstanding the net 30 day term, the customer is usually considered delinquent and special payment terms may have to be negotiated." Affidavit of Ronald Quick, dated March 23, 1989.

One of the other defendants, Hardware Services, Inc., presented the unsigned affidavit of K. Matsunaga. Mr. Matsunaga's affidavit states that "[a]lthough the payment terms on most invoices are Net 30 days, the usual and customary date of payment from the date of invoice is between sixty-five to 135 days." Aside from the authentication problems with Mr. Matsunaga's affidavit, an industry standard of payment within sixty-five to 135 days of the invoice date is useless as a yardstick for measuring the course of dealings or ordinary business terms. It is like saying that there are no ordinary business terms or practices at all.[8] Moreover, the unsigned affidavit does not really say that standard industry credit terms are 65 to 135 days, but only that it is "usual and customary" for customers to pay that long after the usual stated invoice terms of 30 days. Thus, even if the affidavit were otherwise in proper form (*i.e.*, signed), it would not support the defendants' position that any of the payments here were made according to ordinary business terms.

On this record, the Court can only conclude that the contractual credit terms and the standard industry credit terms, are both net thirty days. Viewing the evidence most favorably to the defendant, the Court cannot find that a payment made seventy-three days after the invoice date was made within the ordinary course of business or according to ordinary business terms. Consequently, the Debtor's motion for summary judgment against Star Stainless Screw will, be granted and Star Stainless Screw's cross-motion for summary judgment will be denied.

## CONCLUSION

The uncontroverted evidence establishes that there are no genuine issues of material fact as to all five of the remaining defendants. The Debtor's motions for summary judgment will be granted as to Full Line Fasteners, Hardware Services, Missouri Plating, Lancaster Threaded and Star Stainless Screw. The cross-motions for summary judgment made by Missouri Plating, Lancaster Threaded and Star Stainless Screw will be denied.

Appropriate orders will be entered.

---

8. In this connection, see DeSimone, *Section 547(c)(2) of the Bankruptcy Code: The Ordinary Course of Business Exception Without the 45 Day Rule*, 20 Akron L.Rev. 95, 127 (1986):

    For the most part, 547(c)(2)(C) was put in to ensure that the parties course of dealing lives up to general business practices. It prevents a creditor from arguing that it was in the parties' ordinary course of business for the debtor to make late payments, or to pay whenever he felt like it. After all, 547(c)(2) is to protect normal business practices; Congress felt that there was no need to protect "unorthodox" or "helter skelter" business transactions. But if the parties' practice is within the generally accepted business practice and it is an established part of the parties' dealings, there should be no need to examine industry standards.